UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BILL ROVID, et al.,

          Plaintiffs,

    v.

GRACO CHILDREN'S PRODUCTS INC., et al.,

          Defendants.

Case No. 17-cv-01506-PJH

**ORDER**

Re: Dkt. Nos. 33, 34, 35, 36, 40

Plaintiffs Bill Rovid and Lisa Smith-Rovid (the "Rovids") are the parents and successors in interest of their daughter, the decedent, Leanne Stephanie Rovid (Leanne or L.R.). On February 12, 2015, Leanne was discovered lifeless in a play yard manufactured by defendant Graco Children's Products, Inc., and sold under the trade name "Pack 'n Play." In short, the Rovids bring product liability claims against defendants Graco Children's Products, Inc. and Newell Brands Inc., Graco's parent company, (collectively, "Graco").

On July 11, 2018, defendants filed four motions: (1) a motion for summary judgment on all claims; (2) a <u>Daubert</u> motion to exclude plaintiffs' expert Michael Leshner; (3) a <u>Daubert</u> motion to exclude plaintiffs' expert Paul Tres; and (4) a motion to strike Leshner and Tres' rebuttal reports. After the briefing schedule on those motions was extended pursuant to stipulation, defendants filed a fifth motion requesting the court strike Leshner's supplemental expert report.

On September 26, 2018, those motions came on for hearing before this court. Plaintiffs appeared through their counsel, Joseph Carcione, Jr. and Josh Markowitz.

Defendants appeared through their counsel, Joseph Krasovec III, and Steven Swaney. Having read the papers filed by the parties and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby rules as follows.

**BACKGROUND**

**A.    Leanne's Death**

On February 12, 2015, plaintiffs dropped off the five-month-old Leanne at "Karen's Daycare"—an in-home child care facility in Livermore, California.  Dkt. 34-2, Ex. A at 20:21-23, 51:5-20.[1]  Around 12:00 p.m., Karen, the operator of the daycare, put Leanne down for her afternoon nap in the Graco play yard that is the subject of this suit (the "subject play yard" or the "subject mattress").  Id. at 48:10-18, 56:2-17.  Leanne was placed on her back, which is how she typically slept, with no other bedding items in the play yard.  Id. at 56:6-17, 60:16-22.

The subject play yard was manufactured in 1996 and has "mesh sides with a floorboard mattress assembly."  Dkt. 34-8, Ex. G. at 55:13-23.  Karen purchased the play yard second hand in 2009 or 2010 and had used it with other children before Leanne's use of it.  Dkt. 34-2, Ex. A at 38:15-23, 40:8-14, 42:24-43:12, 46:18-47-2.

Karen checked on Leanne every fifteen minutes between 1:00 p.m. and 3:00 p.m.. Id. at 65:14-17.  When Karen checked on Leanne at 3:00 p.m., she found that Leanne had rolled from her back onto her stomach.  Id. at 64:12-65:4.  Karen found Leanne laying in the middle of the mattress on her stomach, not trapped or wedged into the side or corner of the play yard.  Id. at 71:3-12.  Because Leanne was on her stomach, Karen checked to see if Leanne was awake and okay, but found her cold to the touch, unresponsive, and not breathing.  Id. at 64:12-65:4, 68:4-10.  Karen then confirmed that Leanne did not have a pulse.  Id. at 70:14-71:2.  After initially performing CPR, Karen

---

[1] Plaintiffs previously settled their claims against Karen's daycare and its owners, Karen and Jerry Lusk.

1    called 911, while her husband took over performing CPR, which he continued until the

2    paramedics arrived.  Id. at 68:11-23, 72:1-9.

3         The paramedics reported that Leanne was in full cardiopulmonary arrest, had no

4    vital signs, and was "limp, pale, unresponsive with cyanosis [bluish discoloration of the

5    skin due to lack of oxygen in the blood] to the extremities."  Dkt. 34-6, Ex. E; Dkt. 34-4,

6    Ex. C at 76:7-77:2.  Hospital records indicate Leanne was in full cardiac arrest on arrival,

7    and, after resuscitation efforts did not restore a pulse, Leanne was declared dead at 3:45

8    p.m.  Dkt. 34-4, Ex. B; Dkt. 34-7, Ex. F.

9         The Alameda County Coroner's Bureau performed a post-mortem investigation

10   into Leanne's death.  Alameda County Coroner Investigator Adam Williams investigated,

11   inter alia, both the hospital and the daycare, and examined Leanne's corpse.  Dkt. 34-7,

12   Ex. F.  Alameda County Deputy Coroner Thomas Wayne Rogers, M.D., performed an

13   autopsy.  Dkt. 34-5, Ex. D; Dkt. 34-4, Ex. C at 15:2-17.  Based on his autopsy and review

14   of Williams' investigative findings, Dr. Rogers determined that the cause of death was

15   consistent with Sudden Infant Death Syndrome ("SIDS").  Dkt. 34-5, Ex. D at 2.

16        Plaintiffs disagree.  Plaintiffs contend that some defect in Graco's play yard

17   caused Leanne to rebreathe her own carbon dioxide.  According to plaintiff, it was that,

18   and not SIDS, that caused Leanne's death.

19   **B.    SIDS and CO2 Rebreathing**

20        "Sudden unexpected infant death (SUID), also known as sudden unexpected

21   death in infancy (SUDI), is a term used to describe any sudden and unexpected death,

22   whether explained or unexplained . . . occurring during infancy."  Dkt. 41-1, Ex. 22 at e2.

23   "SIDS is a subcategory of SUID and is a cause assigned to infant deaths that cannot be

24   explained through case investigation including autopsy, a scene investigation, and review

25   of clinical history."  Id.  The distinction between explained SUID deaths, such as

26   unintentional suffocation, and those attributable to SIDS can be challenging.  Id.

27        "In the early nineties, the product safety community identified a potential hazard to

28   sleeping infants from the potential of exhaled carbon dioxide to be stored in soft surfaces

and the[n] inhaled again, reducing the supply of oxygen and leading to asphyxiation." Dkt. 41-1, Ex. 3 at 2. Some doctors categorize $CO_2$ rebreathing-related asphyxiation as a form of "positional asphyxia": "Positional asphyxia results when an infant's nose and mouth are pressed against some material that does not allow the baby to breathe. Positional asphyxia can also be caused by re-breathing." Dkt. 41-1, Ex. 1 at 2-3. The latter can occur when an infant is lying face down on a "sleep surface [that] traps the [exhaled] $CO_2$ [ ] caus[ing] the $CO_2$ concentrations to rise." Id. at 3. When that occurs, the infant, like any human, would become more sleepy and unarousable. Id. If the $CO_2$ levels keep rising an infant unable to arouse herself or reposition her face will die. Id.

Numerous factors can affect a surface's tendency to cause asphyxiation. For example, in one study involving sleep surfaces not at issue in this case, the authors discussed the softness and malleability of the surfaces, which contributed to whether the sleep surface formed a lasting pocket that molded to the infant's head. Dkt. 41-1, Ex. 3 at 3 (plaintiffs' expert quoting Kemp JS, Thach BT, Sudden death in infants sleeping on polystyrene-filled cushions, New England Journal of Medicine (1991)). The same study noted that rebreathing potential was also affected by how easily the subject exchanged respiratory gases with the surface's interior. Id. That required "[t]he cover and the filling [to] have low resistance to airflow but [also] limit the diffusion and convection of expired gases. This suggests that the porosity of bedding should be measured" because "[b]edding with high porosity can therefore form a reservoir of expired gases." Id.

## DEFENDANTS' MOTIONS TO EXCLUDE PLAINTIFFS' EXPERTS

### A. Daubert Legal Standard

A witness who has been qualified as an expert by knowledge, skill, experience, training, or education may give an opinion on scientific, technical, or otherwise specialized topics if (1) the expert's scientific, technical, or other special knowledge will help the trier of fact understand the evidence or determine a fact in issue, (2) the testimony is based upon sufficient facts or data, (3) the testimony is the product of reliable principles and methods, and (4) the witness has reliably applied the principles

4

and methods to the facts of the case.  Fed. R. Evid. 702; see also Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).

The proponent of expert testimony bears the burden of establishing by a preponderance of the evidence that the admissibility requirements are met.  See Fed. R. Evid. 702, Advisory Committee Notes.  Although relevant evidence enjoys the presumption of admissibility, the trial court is obliged to act as a "gatekeeper" with regard to the admission of expert scientific testimony under Rule 702.  Daubert, 509 at 597; see also Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147 (1999).  "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  Daubert, 509 U.S. at 592-93.

Thus, Daubert requires a two-part analysis.  Id. at 592-93.  The court first determines whether an expert's testimony reflects "scientific knowledge," whether the findings are "derived by the scientific method," and whether the work product is "good science"—that is, whether the testimony is reliable and trustworthy.  Daubert, 509 U.S. at 590, 590 n.9, 593.  The court then determines whether the testimony is "relevant to the task at hand."  Id. at 597.

Scientific evidence is reliable if it is grounded in methods of science—the focus is on principles and methodology, not on conclusions.  Metabolife Int'l, Inc. v. Wornick, 264 F.3d 832, 841 (9th Cir. 2001).  In determining whether an expert's reasoning or methodology is scientifically valid, the district court can consider "many factors," Daubert, 509 U.S. at 593–95, including (1) whether a scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential error rate; and (4) whether the theory or technique is generally accepted in the relevant scientific community. Metabolife, 264 F.3d at 841 (citing Daubert, 509 U.S. at 593–94).

Nevertheless, depending on the type of expert testimony offered, these factors may not be appropriate to assess reliability.  Kumho Tire, 526 U.S. at 150.  Other factors

that might be considered to assess reliability include whether an expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion, see General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."), or whether an expert has adequately accounted for obvious alternative explanations, see Claar v. Burlington Northern R. Co., 29 F.3d 499, 502 (9th Cir. 1994). In addition, the trial court should ensure the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 U.S. at 152.

Rule 702's second prong concerns relevancy, or "fit." See Daubert, 509 U.S. at 591. Expert opinion testimony is relevant if the knowledge underlying it has a "valid . . . connection to the pertinent inquiry." Id. at 591-92. As Rule 702 requires, it must "assist the trier of fact to understand the evidence or to determine a fact in issue." Id. at 591. But "scientific validity [and relevance] for one purpose is not necessarily scientific validity for other, unrelated purposes." Id.

**B.    Michael Leshner**

Plaintiffs' expert Michael Leshner was retained to study how the subject mattress and "exemplar" mattresses compared to other similar infant sleep surfaces in a carbon dioxide rebreathing performance test. Dkt. 33-2, Ex. A at 1 (Leshner's initial expert report). Leshner used a mechanical breathing model to simulate the respiratory volume and frequency typical of an infant. Id. at 2.[2] In short, using a toy doll, the model

---

[2] Leshner's model purportedly replicates a 1998 study performed by Carleton et al., entitled "Mechanical model testings [sic] of rebreathing potential in infant bedding materials" (henceforth, "Carleton et al."). See Dkt. 33-2, Ex. A at 3, 35; Dkt. 33-7, Ex. F. Similar toy-doll tests have been used by researchers in the field of infant care for over 30 years. See Ex. A at 2; see also, e.g., Dkt. 44-1, Ex. 1 (2012 study); Ex. 11 (2003 study), Ex. 12 (1998 study).

introduces CO2 into the breathing circuit at a controlled rate to simulate the infant's rate of metabolism.  <u>Id.</u>  Under free breathing conditions—i.e., unobstructed breathing—the model generates a 5% CO2 level in the infant airway.  <u>Id.</u>  That figure is used as the baseline calibration.  <u>Id.</u>  During testing, if the model "rebreathes" its own exhaled CO2, the concentration of CO2 in the lungs and airways becomes elevated and the CO2 percentage reading rises.  <u>Id.</u>  The basic set up is:



<u>Id.</u> at 2.

Leshner test involved two steps.  First, Leshner calibrated each doll-mattress combination by obtaining the baseline 5% CO2 with the toy doll in a sideways facing position.  After the initial calibration, Leshner tested the mattress' rebreathing performance by placing the doll face down:



(0) Subject Mattress                    (52) Graco Pack n Play Play Yard Snuggle Suite LX Small Pad

<u>Id.</u> at 18 (the subject play yard on the left).

Leshner performed this test on 42 mattresses simultaneously, including the subject play yard and three "exemplar mattress" that, for unspecified reasons, Leshner "believe[d] to be equivalent to the subject" play yard. <u>Id.</u> at 3-5. Leshner performed his test only twice. Dkt. 33-3, Ex. B at 287:17-21; Dkt. 33-2, Ex. A at 3-5. Once with only the doll and once with a one kilogram bag of BBs on top of the doll's head. Dkt. 33-3, Ex. B at 287:17-21; Dkt. 33-2, Ex. A at 3-5. On the former test, Leshner recorded a 11.65% $CO_2$ rebreathing result for the subject mattress. Dkt 33-2, Ex. A at 4. On the latter, the subject mattress recorded a 15.00% $CO_2$ reading. <u>Id.</u> By way of comparison, the other mattresses' "rebreathing performance" was in the 6.5% $CO_2$ to 8% $CO_2$ range for both tests. <u>Id.</u>[3] Leshner, however, does not explain how these values correlate to what a live infant would experience. Nor does he explain what objective standard these values should be compared against—i.e., Leshner does not explain what a dangerous or safe %$CO_2$ level reading would be.

Along with Leshner's formal "conclusions" discussed below, Leshner made other observations that show how plaintiffs' design theory has vacillated over time. In a section of his report titled "Sudden Infant Death Syndrome (SIDS) and $CO_2$ Rebreathing," Leshner stated that though "suffocation, asphyxiation, smothering and choking are terms

---

[3] Nowhere does Leshner clearly explain at what point during the test he took the %$CO_2$ recording. For example, Carleton et al. provided a "running, time weighted average," as well as the mean of the maximum $CO_2$ recorded over multiple tests. <u>See</u> Dkt. 33-7, Ex. F at 325-326.

that have been used to describe impaired breathing in SIDS cases attributed to soft sleep surfaces," "in [his] opinion, none of th[ose] [ ] terms adequately describe the mechanisms in death cases where the face is pressed against a soft sleep surface. The issue at hand for many mattresses is that the padding itself is a medium that stores gas." Id. at 7. "[T]he baby exhales into the mattress and that exhaled gas is stored within the mattress" until the baby inhales the stored $CO_2$ on its next breath. Id. at 8. Leshner opined that based on his experience and testing "[t]he properties of gas storage within the padding and permeability of the fabric shell tend to make a very large difference in $CO_2$ rebreathing performance." Id. at 9. But, importantly, Leshner is not a medical expert qualified to testify about SIDS or rebreathing-related asphyxiation. And Leshner did not test for whether a mattress' propensity to store gas, as opposed to some other design feature, caused the elevated $\%CO_2$ results.

In any event, Leshner's formal conclusions were as follows:

1. Among the play yard mattresses tested, the Graco Pack n Play mattresses produced the highest and most hazardous concentration of $CO_2$ rebreathing in the test series;

2. The subject Graco Pack n Play mattress produced a level of $CO_2$ rebreathing similar to infant products that have been banned as potentially hazardous.

3. Sleep surfaces producing high levels of $CO_2$ rebreathing in the infant model are expected to produce a similar result in live infants, and;

4. The subject mattress and similar exemplars are hazardous to infants and defective in design.

Id. at 10.[4]

### 1. Leshner's Initial Report Must Be Excluded Under Daubert

As discussed, under Daubert the court must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence

---

[4] Leshner also performed his test on other common surfaces, such as a fleece and a towel, and found that the subject mattress' $\%CO_2$ result was greater than some of those surfaces. See Dkt. 33-2, Ex. A at 7.

based on scientifically valid principles will satisfy those demands." <u>Daubert</u>, 509 U.S. at 597. The court finds that Leshner must be excluded from testifying because both his testing and his conclusions are not sufficiently reliable—i.e., Leshner's testimony fails <u>Daubert's</u> reliability prong. Leshner's testimony must also be excluded because it fails <u>Daubert's</u> relevancy prong.

### a.   Leshner's Methodology Is Not Sufficiently Reliable

Leshern's methodology is unreliable for at least three reasons.

First, Leshner's results are the product of a single test. "The results of any scientific test should be repeatable at least three times in order to eliminate the possibility of results being skewed by conditions specific to the time that the test was first conducted." <u>Avon Prod., Inc. v. S.C. Johnson & Son, Inc.</u>, 984 F. Supp. 768, 787 (S.D.N.Y. 1997) (Sotomayor, J.) (declining to credit test conducted only once with no replications). That is because "reproducibility is the sine qua non of science." <u>United States v. Hebshie</u>, 754 F. Supp. 2d 89, 125 (D. Mass. 2010). Without multiple tests, Leshner cannot show that his results are reproducible or reliable. Indeed, the Carleton et al. methodology—the methodology Leshner claims to have followed—calls for "a minimum of three repetitions for each test." <u>See</u> Dkt. 33-7, Ex. F at 325. And Carleton et al., unlike Leshner, uses that replication to calculate the mean and "standard error" (or standard deviation) of the results. <u>Id.</u> Leshner gives no reason for departing from that approach. <u>See</u> <u>Brown v. Burlington N. Santa Fe Ry. Co.</u>, 765 F.3d 765, 773 (7th Cir. 2014) ("an expert must do more than just state that she is applying a respected methodology; she must follow through with it."). Leshner's use of a single test prevents him from calculating averages or error rates as required by Carleton et al. Those figures would also provide information about the "potential rate of error of the technique," a <u>Daubert</u> factor. <u>See Daubert</u>, 509 U.S. at 593–95; Fed. R. Evid. 702, 2000 Advisory Committee Notes.[5]

---

[5] In fact, Leshner admitted that the spread (or range) of data indicates "what variables may be uncontrolled" and that "if there's an uncontrolled variable, you would expect a

United States District Court
Northern District of California

1    Plaintiffs respond that Leshner tested 42 mattresses simultaneously, so there can

2    be no claim that the conditions were different during the different testing sessions.  That

3    argument misses the point.  Each of the 42 mattresses tested are different, repetition

4    requires the test to be run on <u>each</u> mattress multiple times.[6]

5    Second, Leshner testified that he applies a "different kind[ ] of rigor in terms of the

6    statistics on the data" when preparing a report for litigation purposes than he does for

7    academic purposes.  Dkt. 33-3, Ex. B at 152:2-25.  But <u>Daubert's</u> "gatekeeping

8    requirement['s] . . . objective . . . is to ensure the reliability and relevancy of expert

9    testimony.  It is to make certain that an expert . . . employs in the courtroom the same

10   level of intellectual rigor that characterizes the practice of an expert in the relevant field."

11   <u>Kumho Tire</u>, 526 U.S. at 152.  True, the Ninth Circuit has recognized that "the standards

12   for courtroom testimony do not necessarily parallel those of the professional

13   publications."  <u>Wendell v. GlaxoSmithKline LLC</u>, 858 F.3d 1227, 1236 (9th Cir.

14   2017), <u>cert. denied sub nom.</u> <u>Teva Pharm. USA, Inc. v. Wendell</u>, 138 S. Ct. 1283, 200 L.

15   Ed. 2d 470 (2018).  But in <u>Wendell</u>, the expert was unwilling to publish because

16   "'opinions are not publishable.  Data is publishable.  What I'm reporting here is my

17   opinion."  <u>Id.</u>  In that circumstance, the Ninth Circuit found <u>Daubert</u> did not present a bar

18   to the highly qualified expert testifying, but nevertheless recognized that "unwillingness to

19   publish weighs against admissibility."  <u>Id.</u>  Here, it is not Leshner's opinion that renders

20   his testing unpublishable, but the rigor Leshner applied to obtaining and analyzing his

21   data.  As discussed, performing a test only once does not meet any standard of rigor—

22   scientific, courtroom, or otherwise.  Plaintiffs' response that Leshner tested 42 mattresses

23   simultaneously, again misses the point.

24   _____

25   different measurement when you test it again."  Dkt. 33-3, Ex. B at 153:14-154:6.
     Because Leshner did not perform multiple tests, he could not know whether there were
26   uncontrolled variables affecting his results.

27   [6] Plaintiffs can also not point to the other "exemplar" mattress to show repetition because
     those mattresses are not a substitute for the 20 year-old subject mattress and Leshner
28   has done nothing to explain why or how those mattresses are exemplary of the subject
     mattress.

Third, Leshner has failed to explain or show whether he controlled for the position of the doll on the mattress.  Leshner testified that he positioned the toy dolls by "put[ting] it down vertically on the mattress and I let go . . . whatever position, depending on the stiffness . . . it[ ] kind of assumes its own position and I didn't attempt to reposition it in" the tests for the initial report.  Dkt. 33-3, Ex. B at 181:2-11.  That method of placement does not control for numerous potentially relevant factors, including (i) the location of the toy doll with respect to the mattress—e.g., on the middle or edge of the mattress; (ii) the position of the toy doll's body on the mattress—i.e., lengthwise or widthwise; (iii) the position of the toy doll's extremities; or (iv) the position of the toy doll's face with respect to its body—a factor that can vary significantly, <u>see</u> Dkt. 33-2, Ex. A at 18-32 (pictures of doll placement).  Leshner agrees that at least the latter factor is an important variable.  Dkt. 33-3, Ex. B at 116:2-19; 201:13-24, 293:4-7.[7]

Leshner's failure to control for the position or to repeat his testing is especially alarming because he testified that "every once in a while, [he'd] put the baby down and [he'd] get a very high reading."  Dkt. 36-7, Ex. F at 278:8-25 ("normally . . . you look at the ones that are clustered close together.  That is typically how data is analyzed.  But in the context of this case what's more important . . . is that high flyer because it's real.").  That highlights the inadequacy of Leshner's testing.  It is exactly because very high readings can occur that scientific rigor requires multiple tests and requires the control of certain variables—such as the positioning of the doll.  It is for the same reason that scientific rigor requires looking at means, averages, standard deviation, etc., and not a mere focus on the "high flyers."  Leshner has done nothing to explain why his testing allows for a departure from those standard scientific and statistical methods.

### b. Leshner's Methodology and Results Do Not Support His

---

[7] Exacerbating the problem is Leshner's failure to control for the placement of the 1kg bag of lead BB's on top of the toy doll's head during the second test.  Dkt. 33-10, Ex. I.  Moreover, plaintiffs have pointed to no evidence showing that the additional weight accurately replicated Leanne's head weight or that a bag of lead BB's on the back of the toy doll's head accurately replicates the weight distribution that would be present.

Even if the court accepted Leshner's methodology, the court would exclude Leshner's expert testimony because Leshner's tests (and results) do not support his broad conclusions.  Though the focus is on principles and methodology and not on conclusions, <u>Metabolife</u>, 264 F.3d at 841, other factors that might be considered include whether an expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion, <u>see Joiner</u>, 522 U.S. at 146.  In addition, a court may exclude expert testimony on the ground that an expert's purported methodology fails to explain his final conclusion.  <u>Id.</u>

As an initial matter, plaintiffs conceded that Leshner's testimony is limited to showing the subject mattress performance in the tests <u>relative</u> to the other mattresses' performance.  Dkt. 44 at 25.  For good reason, Leshner expressly limited his task to that purpose: "My testing was to measure the CO2 re-breathing . . . and compare all these different materials for their performance."  Dkt. 48-2, Ex. A at 178:5-20.  Indeed, the Carleton et al. study upon which Leshner supposedly based his testing also limits its results to that purpose: "We believe that the[ ] [CO2] concentrations are useful as a <u>relative measure</u> of rebreathing potential . . . of the bedding materials."  Dkt. 33-7, Ex. F at 326 (emphasis added); <u>see also id.</u> at 327 ("The model described in this paper establishes a way to measure and compare the rebreathing potential quantitatively in different bedding materials.").  Thus, even if Leshner's testing was scientifically sound, his conclusions based upon that testing should be limited to that narrow scope and comparative nature.  At best, only Leshner's second conclusion and part of his first conclusion reflect the limited nature of Leshner's inquiry.  <u>See</u> Dkt 33-2, Ex. A at 10.

Further, and independently fatal, Leshner's results do not support his conclusions because his "%CO2" rebreathing performance results have no objective benchmark or threshold to be compared against.  That is, even if Leshner's testing satisfactorily showed that one mattress performed better (i.e., had a lower %CO2 reading) on the test than a different mattress, nothing in the record explains how that %CO2 reading correlates to

the real world or an objective standard. Neither Leshner nor plaintiffs have pointed to a standard, threshold, or anything else showing that, for example, a 11% $CO_2$ result is dangerous or safe. Leshner's expert report also provides no basis for claiming any particular %$CO_2$ rebreathing result is hazardous. In fact, Leshner himself could not identify the maximum acceptable level of %$CO_2$. Dkt. 33-3, Ex. B. at 102:14-23. Nor was he able to state whether 7.35% $CO_2$—an average result on Leshner's test—was safe or hazardous. Id. at 212:12-213:5. The concept of $CO_2$ rebreathing is merely a measurement of "how [a mattress] performs in [Leshner's] test." Id. at 90:6-21 ("[I]t's the performance of the mechanical model that I'm reporting"). But that says nothing about and gives Leshner no basis to conclude anything about whether the subject mattress gives rise to a "hazardous" level of $CO_2$ rebreathing. See Dkt. 33-10, Ex A at 10 (Conclusions 1, 2, and 4).

Leshner's definition of "hazardous" does not help. Leshner testified: "I define more $CO_2$ as more hazardous, it's a continuum, from low to high." Dkt. 33-3, Ex. B. at 212:25-213:3. That is not how "hazard" generally works. Many, if not most, substances do not become hazardous until a certain threshold level is reached. Without supporting evidence or qualifying expertise, Leshner cannot merely assert that any amount of $CO_2$ rebreathing is hazardous.[8] Further, Leshner's proposed definition renders his "hazard"-related conclusions misleading and meaningless.

In addition, even if some standard or threshold existed that showed what %$CO_2$ result in the test was too high, that standard could not be used to extrapolate Leshner's results to live infants—as Leshner attempts to do. Leshner himself testified: Q. "Okay. So you're not trying to relate your results to a live infant. A. I'm not a medical doctor. . . because it's a mechanical model, it's the performance of the mechanical model that I'm reporting." Id. at 90:6-21. Rightfully so. Carleton et al. made clear that the tests results could not be equated to expected results in live infants because the testing likely

---

[8] A counterintuitive proposition indeed considering the chemical composition of air.

14

United States District Court
Northern District of California

produces "exaggerate[d]" results compared to what a live infant would experience. Dkt. 33-7, Ex. F at 326 ("Because the model cannot physically respond to increased CO2 like an infant (the model's breathing rate and volume are fixed), CO2 rapidly equilibrates in the 'trachea' at concentrations that probably exaggerate the effect an infant would experience."). Leshner agrees. Dkt. 33-3, Ex. B at 228:12-229:12, 231:16-233:1. In fact, Carleton et al. specifically stated that "it would not be appropriate to speculate on the role that rebreathing might have played in any specific case, based solely upon" the testing results. Dkt. 33-7, Ex. F at 327. Leshner again agrees. Dkt. 33-3, Ex. B at 232:6-23.

In short, plaintiffs and Leshner have not shown that the %CO2 results have any correlation to a mattress producing a hazardous level of CO2 rebreathing and have also failed to connect the doll-based results to live infants. Thus, Leshner's testing and results fail to explain his final conclusions. The court finds that provides an independent basis— distinct from the above discussed unreliable methodology—for excluding Leshner's testimony. Joiner, 522 U.S. at 146; see, e.g., Sanderson v. Int'l Flavors & Fragrances, Inc., 950 F. Supp. 981, 999-1000 (C.D. Cal. 1996) (expert's opinion that a certain level of exposure to substance was toxic was inadmissible, because there was "no published statistics that would allow him to calculate or quantify the relative risk" and thus there was no "scientific connection" between his data and opinion).

### c. Leshner's Initial Report Fails Daubert's "Relevancy" Requirement

Daubert and Rule 702 require expert testimony to be both reliable and "relevant to the task at hand." Daubert, 509 U.S. at 591, 597. The latter requires that the expert's testimony "fit" the facts of the case. Id. at 591. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." Id. For reasons similar to those discussed above, the court finds that Leshner's testimony fails Rule 702 and Daubert's relevancy requirement. Daubert, 509 U.S. at 591-92 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."). In fact, Leshner testified that his toy doll testing did not even attempt to

15

simulate the position in which Leanne was found.  Dkt. 48-2, Ex. A at 178:5-20.  The testimony's failure to meet <u>Daubert's</u> relevancy requirements provides an independent basis for exclusion.

### 2. Leshner's Rebuttal Report Must Be Struck.

Defendants argue that Leshner's rebuttal report violates Federal Rule of Civil Procedure 26 because it contains entirely new theories.  The court agrees.  Leshner's rebuttal report not only includes theories never previously disclosed but in fact contains theories inconsistent with Leshner's initial report.

Rule 26(a)(2)(B) provides that an expert witness' opening report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them" together with "the facts or data considered by the witness in forming them" and "any exhibits that will be used to summarize or support them."  Fed. R. Civ. P. 26(a)(2)(B)(i)–(iii).  Rebuttal disclosures of expert testimony are "intended solely to contradict or rebut evidence on the same subject matter identified by another party" in its expert disclosures.  Fed. R. Civ. P. 26(a)(2)(D)(ii).  "Rule 37(c)(1) gives teeth to these requirements by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed."  <u>Yeti by Molly, Ltd. v. Deckers Outdoor Corp.</u>, 259 F.3d 1101, 1106 (9th Cir. 2001).  This rule requires the exclusion of untimely expert witness testimony, unless the "part[y's] failure to disclose the required information is substantially justified or harmless."  <u>Id.</u> (citation omitted).

Leshner's initial report put forth a single (if unsupported) theory about what caused increased levels of rebreathing: "In my opinion . . . the issue at hand for many mattresses is that the padding material itself is a medium that stores gas."  Dkt. 33-2, Ex. A at 7; <u>see also id.</u> at 7-9.  Leshner's rebuttal report pivots to an entirely different theory that attributes rebreathing performance to different mattress design features: "$CO_2$ rebreathing performance is not equated with the propensity of a substrate to store $CO_2$. Rather, $CO_2$ rebreathing performance involves more than just the substrate. . . . [T]he mechanical interaction between the infant's face and the mattress surface are critical

factors, including any wrinkling of the mattress cover and thickness of the padding." Dkt. 42-1, Ex. 5 at 9 (internal quotation marks omitted); id. at 12 ("the most relevant material property affecting the CO2 rebreathing performance" is "density"). The "pocket[ing]" formed around the infant's face, "more than any other feature, increases the risk for rebreathing." Id. at 6. The rebuttal report also asserts that other "critical factors" include "infant position, wrinkles in the fabric cover, weight of the head, the infant's temperature, and the temperature in the room." Id. at 12. Leshner's initial report is devoid of reference to pocketing, density, or any of the other "critical factors" the rebuttal report identifies.

Moreover, the facts show that Leshner previously formed conclusions about those additional variables but failed to include them in his initial report. See, e.g., Dkt. 36-7, Ex. F at 256:3-7 (Q. "You don't mention [the mattress forming a pocket around the face] at all in your initial report; correct? A. I don't think I spelled it out in the initial report, although I think I understood it at the time."); 292:4-7 ("Before the -- the -- I read your expert reports, I did see that wrinkling appeared to be a factor."). Leshner also testified that the initial report did not include possible factors because he "wasn't trying to explain why the results were the way they were" because he was "just measuring the CO2 and reporting it." Id. at 256:3-15. That, however, is not true. As discussed above, the initial report put forth a very specific explanation: The mattress stored exhaled gases, allowing the gases to be rebreathed on the next breath cycle.

Leshner's failure to include in his initial report the features he believed actually contributed to the mattress storing gas deprived defendants' experts of a chance to respond to Leshner's true theory. See generally Dkt. 42-1, Ex. 1 (defendants' expert discussing Leshner's initial theory that mattresses "store CO2."). And Leshner's about-face in his rebuttal report is the exact sort of sandbagging that Rule 26 is designed to prohibit. See, e.g., Rodas v. Porsche Cars N. Am., Inc., No. CV14-3747 PSG (MRWX), 2016 WL 6033535, at *9 (C.D. Cal. Apr. 4, 2016) (excluding rebuttal testimony because "[a] rebuttal report should directly respond to or address 'new unforeseen facts' brought out in the other side's report on the same subject matter, and is not the 'proper place for

presenting new arguments.'"); In re High-Tech Emp. Antitrust Litig., 2014 WL 1351040, at

*12 (N.D. Cal. April 4, 2014) (striking part of rebuttal report because "Plaintiffs will not be

allowed to 'sandbag' Defendants with new analysis that should have been included at the

very least in [expert's] opening merits report.").

Plaintiffs argue that Leshner is neither opining on the appropriate design of the

subject play yard nor on whether the mattress was defective.  Dkt. 44 at 2 ("The testing is

not being used by [ ] Leshner to opine that the product was defective."); see also Dkt 42-

1, Ex. 5 at 9 ("I have not opined on the appropriate design of the subject Graco play yard.

I have reported on some of the design features that result in elevated $CO_2$ rebreathing

performance.").  That argument falls flat because Leshner's initial report concludes that

"The subject mattress [is] . . . defective in design."  Dkt. 33-2, Ex. A at 10.  And taking the

concession at face value would require excluding any reference about purported design

features—e.g., gas retention, wrinkling, pocketing, etc.—that purportedly contribute to

increased $CO_2$ rebreathing.  That would leave little more than Leshner's standard-less

%$CO_2$ results that, as explained above, lack reliability and have little relevance to

Leanne's death.[9]

The court finds that defendants have shown that Leshner's rebuttal report violated

Rule 26 by untimely disclosing new expert testimony.  The burden thus shifts to plaintiffs

to show that the violation was substantially justified or harmless.  Yeti by Molly, 259 F.3d

[9] In any event, Daubert also requires the exclusion of Leshner's opinions about what
design features he believes cause increased $CO_2$ rebreathing because neither his initial
report nor his rebuttal report tests for whether any particular feature contributes to
increased rebreathing.  Thus, neither report provides any basis for Leshner's opinions on
that topic.  The rebuttal report does reference a "worst-case analysis" that purportedly
investigated certain "worst-case combinations" of wrinkling and head position.  Dkt. 42-1,
Ex. 5 at 18.  But the report fails to provide any information about how the test was
performed, rendering it unrepeatable.  City of Pomona v. SQM N. Am. Corp., 750 F.3d
1036, 1047 (9th Cir. 2014) ("Under Daubert's testability factor, the primary requirement is
that '[s]omeone else using the same data and methods . . . be able to replicate the
result[s].'" (ellipses in original)).  The "worst-case analysis" testing also fails Daubert's fit
requirement because nothing in the record shows that Leanne experienced Leshner's
undescribed "worst-case."

at 1106.  Plaintiffs fail to carry that burden.  Plaintiffs argue only that the rebuttal report was served before expert depositions took place.  But that argument fails to account for defendants' retention of multiple experts to prepare reports in response to Leshner's initial theory, only for those expert reports to be effectively nullified by Leshner's rebuttal report's about-face.  Accordingly, the court finds that Leshner's rebuttal report must be struck and the testimony therein must be excluded.  Id. ("Rule 37(c)(1) . . . forbid[s] the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed.").[10]

### 3. Leshner's Supplemental Report Must Be Struck

This courts scheduling order, which was stipulated to by the parties, called for plaintiffs' expert disclosures to be submitted by May 18, 2018, defendants' expert disclosures to be submitted by June 1, 2018, and rebuttal expert reports to be submitted by June 15, 2018.  Dkt. 32.  The cut off for expert discovery was June 29, 2018.  Id.  The same order set dispositive motions to be heard by August 15, 2018.

In accordance with that order, defendants filed 4 motions on July 11, 2018, including, as relevant here, a motion for summary judgment on all claims, based primarily on the inadequacy of plaintiffs' experts' reports, and a Daubert motion seeking the exclusion of Michael Leshner.  The parties subsequently stipulated to continue the hearing date on those motions and to set a lengthier briefing schedule.  The parties did so primarily because "Opposition to these motion[s] will require depositions of at least two of defendant[s'] experts [and] [p]laintiffs [would] not have sufficient time to properly prepare opposition to the[ ] motions."  Dkt. 38 at 2.  The court granted that stipulation and

---

[10] There is also no merit to plaintiffs' argument that the expert discovery schedule somehow prejudiced them.  See Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc., No. C 01-20418 JW, 2005 WL 1459572, at *2 (N.D. Cal. June 21, 2005) (employing similar schedule because plaintiffs bore the burden of proof).  And if plaintiffs did perceive prejudice, the correct course of action was to move for a schedule change— not violate Rule 26.

set a hearing for those motions for September 26, 2018, with oppositions due on August 29, 2018.

On August 14, 2018, plaintiffs produced Leshner's third report in this litigation, purportedly a "supplemental" report. That report was prepared and submitted because defendants' expert "challenged the completeness, accuracy, and reliability of the measurements reported in" Leshner's initial and rebuttal reports. Dkt. 40-2, Ex. A at 1 (Leshner Supplemental Report). In response to those criticisms, inter alia, Leshner re-ran his test three times on all 42 mattresses, with and without the 1kg bag of BBs. Id. at 6. Leshner also used an "alignment pin" to ensure a uniform head position for each doll in each test. Id. at 7. The average of the three tests was taken and reported in the supplemental report. Id. at 8-10. In addition, the supplemental report "address[es] a claim made by defendant[s] in their motion to exclude [Leshner's] testing." Id. at 1, 12.

The Ninth Circuit has previously rejected that use of Rule 26(e):

> Plaintiffs [ ] argue that the district court should have admitted the untimely expert declarations pursuant to Federal Rule of Civil Procedure 26(e), which requires supplementation of an initial expert disclosure "if the party learns that in some material respect the disclosure . . . is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." But Rule 26(e) creates a "duty to supplement," not a right. Nor does Rule 26(e) create a loophole through which a party who submits partial expert witness disclosures, or who wishes to revise her disclosures in light of her opponent's challenges to the analysis and conclusions therein, can add to them to her advantage after the court's deadline for doing so has passed. Rather, "[s]upplementation under the Rules means correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure." Keener v. United States, 181 F.R.D. 639, 640 (D. Mont. 1998).

Luke v. Family Care & Urgent Med. Clinics, 323 F. App'x 496, 499–500 (9th Cir. 2009).

That discussion applies here. Plaintiffs do not contend that the supplemental report "corrects inaccuracies" or that Leshner's original report was "incomplete" based on newly discovered information—both of which would be proper uses of Rule 26(e).

20

Instead, Leshner prepared and submitted the supplemental report to respond to defendants' criticisms, "so there c[ould] be no question of its completeness, accuracy, or reliability." Dkt. 40-2, Ex. A at 1. That is not the proper use of Rule 26(e). That is because the supplemental report attempts to strengthen or deepen opinions "in light of [the expert's] opponent's challenges to the analysis and conclusions therein." Luke, 323 F. App'x at 500. That type of report is the exact type of supplemental report that the Ninth Circuit and courts across this Circuit have held should be excluded or struck under Rule 37(c). See, e.g., id. at 499-500; Jarrow Formulas, Inc. v. Now Health Grp., Inc., No. CV 10-8301 PSG JCX, 2012 WL 3186576, at *15 (C.D. Cal. Aug. 2, 2012), aff'd, 579 F. App'x 995 (Fed. Cir. 2014) ("a supplemental expert report that states additional opinions or seeks to strengthen or deepen opinions expressed in the original expert report is beyond the scope of supplementation and subject to exclusion under Rule 37(c)."); Fed. Deposit Ins. Corp. v. Van Dellen, No. CV 10-4915 DSF (SHX), 2012 WL 12886825, at *2 (C.D. Cal. Nov. 6, 2012) (striking "supplemental" report that attempted to provide a substantive rebuttal to expert report, because supplemental report was "more in the nature of a rebuttal" disclosed after expert discovery cutoff dates).

Nor have plaintiffs shown that their failure was "either substantially justified or harmless," as required under Rule 37(c)(1). The best plaintiffs can muster is (i) that Leshner could not perform further testing because the mattresses were in Graco's custody until July 26, 2018, and (ii) that the delay was harmless because plaintiffs offered Leshner up for another deposition. Those arguments fail. As to the former, plaintiffs knew of defendants' criticisms as of June 1, 2018—defendants' expert disclosure deadline. If plaintiffs needed more time to respond or conduct retesting, the appropriate response would be to request a continuance and include the new testing results in a rebuttal report; not file a supplemental report weeks after the dispositive motion deadline.

Plaintiffs' latter response ignores all of defendants' other prejudice, including the defendants' preparation and filing of four motions and the defendants' retention of experts in support of those motions. Those litigation activity expenses constitute sufficient

1  prejudice. <u>Bell v. United States</u>, No. 12CV1053-CAB (DHB), 2013 WL 12072523, at *3

2  (S.D. Cal. Nov. 25, 2013) (additional litigation expenses related to re-opening expert

3  discovery, along with delaying trial schedule constituted sufficient prejudice to deny

4  request to submit supplemental report).  In addition, "[d]isruption to the schedule of the

5  court and other parties in that manner is not harmless."  <u>Wong v. Regents of Univ. of</u>

6  <u>California</u>, 410 F.3d 1052, 1062 (9th Cir. 2005) (affirming exclusion of evidence where

7  witness was disclosed after the court ordered deadlines for completion of discovery and

8  pretrial motions).

9  　　　Accordingly, the court strikes Leshner's supplemental report under Rule 37(c).

10  <u>See Yeti by Molly</u>, 259 F.3d at 1106 ("The Advisory Committee Notes describe it as a

11  'self-executing,' 'automatic' sanction to 'provide[ ] a strong inducement for disclosure of

12  material....'").

13  　　　**C.　　Paul Tres**

14  　　　The court also finds that plaintiffs' expert Paul Tres must be excluded under

15  <u>Daubert</u>.

16  　　　Rule 702 provides that an expert witness may give an opinion on scientific,

17  technical, or otherwise specialized topics if (1) the expert's scientific, technical, or other

18  special knowledge will help the trier of fact understand the evidence or determine a fact in

19  issue, (2) the testimony is based upon sufficient facts or data, (3) the testimony is the

20  product of reliable principles and methods, and (4) the witness has reliably applied the

21  principles and methods to the facts of the case.  Fed. R. Evid. 702.

22  　　　Tres' expert report fails to meet any of those requirements.  Tres was retained "[t]o

23  review and analyze the Graco exemplar [mattress] samples and additional manufacturers

24  samples and write down [his] opinions and findings."  Dkt. 35-4, Ex. C at 2.  But nothing

25  in Tres' report indicates that he inspected and analyzed any mattress, including the

26  subject play yard.  <u>See id.</u> at 3 (listing 14 mattresses but not identifying the the subject

27  mattress).

28  　　　Nor does Tres explain what his purported analysis and inspection involved.  Tres

only states that "The inspection and analysis included using a digital microscope with a maximum magnification of 500x. All samples shown above have been analyzed and pictures were taken using the digital microscope." Id. But other than attaching a single— non-microscopic—picture of eight samples, Tres says nothing about how he analyzed the listed mattresses or what, if anything, he tested for.

Tres' report is also devoid of any findings, results, or opinions. That independtly warrants exclusion. Even if Tres had performed some undisclosed inspection on the mattresses and had tested for some unspecified feature, Tres does not report the results of that analysis. In addition, though Tres has an "Opinions" section, that section contains no opinions at all, id. at 3-11, much less opinions about this action.[11] Instead, Tres' "Opinions" section provides a general overview about the types of polymeric foams available, the range of uses for that type of foam, and a description of two methods of ensuring foam is high quality. Id. Tres' never applies that background to any foam sample, much less the subject mattress' foam. Nor does Tres tie any particular type of foam to the foam in the subject mattress or to any other "tested" mattress' foam.

Plaintiffs argue that Tres "was retained to provide the jury [with] an understanding of the vast range of products that are foam, and the wide range of performance characteristics that can be achieved." Dkt. 43 at 1. Specifically, plaintiffs argue that Tres' testimony is relevant to two factors listed in the applicable CACI jury instruction: "feasibility of an alternative safe design at the time of manufacturer" and the "cost of an alternative design." Id. at 2. That argument fails because Tres' untethered general background regarding a particular (potentially unrelated) type of foam does not address either topic.

Daubert requires the court to function as a "gatekeeper" with regard to the admission of expert scientific testimony under Rule 702. Daubert, 509 U.S. at 597. As

---

[11] Indeed, it is difficult to see how Tres could have formed opinions about this action. The report's "Accident Summary" is empty and the only material Tres reviewed was Leshner's report and the deposition transcript of Graco's foam engineer. Dkt. 35-4, Ex. C at 2-3.

discussed, that gatekeeping role requires the court to perform a two-part analysis. The court must first determine whether an expert's testimony reflects "scientific knowledge," whether the findings are "derived by the scientific method," and whether the work product is "good science"—that is, whether the testimony is reliable and trustworthy. Daubert, 509 U.S. at 590, 593, & n. 9. Because Tres' report is devoid of, inter alia, his findings and his methodology, the court cannot determine whether his testimony reflects scientific knowledge or whether it is the product of "good science." Similarly, because Tres makes no attempt to tie his general background to the facts of this action or to any relevant issue in this action, the court cannot determine whether his testimony is "relevant to the task at hand," as required by the second part of the Daubert analysis. Id. at 597.

Accordingly, Tres must be excluded under Rule 702 and Daubert.[12]

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Rovids have two remaining causes of action: (1) strict products liability, including punitive damages under Cal. Civ. Code § 3294; and (2) general negligence.[13]

**A.    Legal Standard**

**1.    Summary Judgment**

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

---

[12] Tres' rebuttal expert report must be struck for multiple reasons. Like the initial report, the rebuttal report fails to provide any methodology or analysis to support its responses to defendants' expert. It also, for the first time, states opinions about the subject mattress. See, e.g., Dkt 36-6, Ex. E at 3-4. As his initial report failed to contain any discussion about the subject mattress or state any opinions, Tres' rebuttal opinions violate Rule 26. In addition, Tres' opinions about the subject mattress find no support in either of Tres' reports, which provides an independent basis for excluding the rebuttal report.

[13] Plaintiffs conceded summary judgment on their warranty claim. Accordingly, defendants' motion is GRANTED as to that claim.

The moving party for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000). When the moving party has met this burden of production, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial. Id. If the nonmoving party fails to produce enough evidence to show a genuine issue of material fact, the moving party wins. Id

At summary judgment, the court must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. See Tolan v. Cotton, 134 S. Ct. 1861, 1865 (2014); Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999).

### 2. Products Liability – Design Defect

A plaintiff may seek recovery in a products liability case under strict liability in tort or on the theory of negligence. Merrill v. Navegar, Inc., 26 Cal. 4th 465, 478 (2001). To show a design defect, a "plaintiff must ordinarily show (1) the product is placed on the market; (2) there is knowledge that it will be used without inspection for defect; (3) the product proves to be defective; and (4) the defect causes injury." Nelson v. Superior Ct., 144 Cal. App. 4th 689, 695 (2006) (internal quotations omitted).

"A manufacturer, distributor, or retailer is liable in tort if a defect in the manufacture or design of its product causes injury while the product is being used in a reasonably foreseeable way." Soule v. General Motors Corp., 8 Cal. 4th 548, 560 (1994). In Barker v. Lull Engineering Co., the California Supreme Court endorsed two tests for demonstrating a design defect. 20 Cal. 3d 413, 429-30 (1978). Under the first test, "a product may be found defective in design if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." Id. at 429. This test is commonly referred

to as the "consumer expectations test." Under the second test, "a product may be found defective in design, even if it satisfies ordinary consumer expectations, if through hindsight the jury determines that the product's design embodies 'excessive preventable danger,' or, in other words, if the jury finds that the risk of danger inherent in the challenged design outweighs the benefits of such design." Id. at 430 (citations omitted).

"[R]egardless of whether the risk-benefit test or the consumer expectations test is being employed, a plaintiff must prove that there *was* a design defect, which actually caused the injury." Pooshs v. Philip Morris USA, Inc., 904 F. Supp. 2d 1009, 1025 (N.D. Cal. 2012) (emphasis in original; collecting cases). Here, the parties agree that the second test—the risk-benefit test—applies. Under that test, "expert testimony is required to assist the finder of fact." Howard v. Omni Hotels Mgmt. Corp., 203 Cal. App. 4th 403, 426 (2012).

Under the risk-benefit test, "plaintiffs must put forward sufficient evidence to make out a *prima facie* case that the *design* of the [product] at issue proximately caused the complained of injury." Conley v. R.J. Reynolds Tobacco Co., 286 F. Supp. 2d 1097, 1108 (N.D. Cal. 2002) (discussing Barker; emphasis in original); Campbell v. General Motors Corp., 32 Cal. 3d 112, 119 (1982) (similar). That requires more than, as plaintiffs argue, merely pointing to evidence that indicates the product caused the injury. See also Conley, 286 F. Supp. 2d at 1108 (rejecting same argument put forth by plaintiffs here). Such a minimal standard would nullify plaintiffs' burden to identify the purported design feature that proximately caused the injury. Instead, to survive summary judgment, plaintiffs "must put forward sufficient evidence to make out a *prima facie* case that some design feature [of the product] . . . caused" the injury. Conley, 286 F. Supp. 2d at 1109. That is, a prima facie case of causation alone is insufficient. See id. at 1109 n.7; Johnson v. United States Steel Corp., 240 Cal. App. 4th 22, 31 (2015) ("A knife manufacturer is not liable when the user cuts himself with one of its knives. When the injury is in no way attributable to a defect there is no basis for strict liability"); Pooshs, 904 F. Supp. 2d at 1025 (cigarettes being cigarettes did not constitute defective design).

1    Only after plaintiffs meet that burden does the burden shift to defendants to show

2    "that the benefits of the challenged design, when balanced against such factors as the

3    feasibility and cost of alternative designs, outweigh its inherent risk of harm."  Chavez v.

4    Glock, Inc., 207 Cal. App. 4th 1283, 1303 (2012).

5    As plaintiffs do here, a plaintiff may also bring a "negligent design" claim.

6    However, "[a]s with an action asserted under a strict liability theory, under a negligence

7    theory the plaintiff must prove a defect caused the injury."  Id. at 1304–05.  And "where[,

8    as here,] liability depends on proof of a design defect, there is no practical difference

9    between negligent design and strict liability design."  Pooshs, 904 F. Supp. 2d at 1025.

10   **B.    Summary Judgment Must Be Granted Because Plaintiffs Have Failed to**

11   **Present Any Evidence That A Design Defect Proximately Caused Leanne's**

12   **Death**

13   Plaintiffs put forth a single theory about how the Graco play yard's design allegedly

14   caused Leanne's death:  the mattress caused Leanne to rebreathe her own $CO_2$ and that

15   led to her eventual death.  Plaintiffs' papers and expert reports, however, fail to settle on

16   how the mattress caused rebreathing.

17   As discussed above, Leshner begins by pointing to the subject mattress'

18   permeability and potential to store exhaled $CO_2$, but ends by pointing to malleability,

19   wrinkling, softness, pocketing, and density.  Of plaintiffs' three medical experts, two relied

20   upon and echoed Leshner's gas entrapment theory.  See Dkt. 41-1, Ex. 2 at 2-4 (Dr.

21   Hardy stating that Leshner proved that "$CO_2$ retention of the [subject] mattress . . . [was]

22   particularly high" and "$CO_2$ accumulation . . . was abnormally high"); Dkt. 41-1, Ex. 21 at

23   12-13 (Dr. Wigren opining that Leshner's report "confirmed that the subject mattress pad

24   [had] high levels of entrapped" $CO_2$).  And the third, Dr. Moon, declined to specify

25   whether she believed Leanne died from rebreathing $CO_2$—caused by the "sleep surface

26   trap[ping] the $CO_2$—or from having her nose and mouth pressed against the mattress.

27   Dkt. 41-1, Ex. 1 at 2-3 (attributing death to "positional asphyxiation").  Importantly,

28   however, plaintiffs' three medical experts failed to perform any testing on the subject

27

mattress (or any other mattress) and put forth no other basis for their opinion that the subject mattress retains exhaled $CO_2$.  <u>Joiner</u>, 522 U.S. at 146 ("nothing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. ")

Plaintiffs' counsel does no better specifying how the subject mattress' design caused the alleged rebreathing.  While the opposition includes a section discussing how historically certain "soft sleep surfaces" have been identified as hazardous, Dkt. 41 at 5-7, the opposition's discussion of this case relies entirely on the expert testimony discussed above that attributes rebreathing to the mattress "entrapping" exhaled $CO_2$.  <u>Id.</u> at 8-15. That's unsurprising as neither party has pointed to any evidence indicating that a different design feature caused Leanne's alleged rebreathing.  What is surprising is that plaintiffs' counsel again pivoted during the hearing and attributed Leanne's rebreathing to the subject mattress' "softness" and its tendency to "pocket," which, according to plaintiffs, causes it to trap CO2.[14]  But there is no evidence that the subject play yard is "softer" or forms a deeper "pocket" than any other mattress, much less evidence that the subject play yard performs poorly on those bases compared to other infant mattress that are over 15 years old.[15]  Leshner's initial report instead embraces a permeability and gas storing-based theory.  Dkt. 33-2, Ex. A at 7.  And Leshner's rebuttal report's opinions that pocketing contributes to rebreathing is nothing more than an ipse dixt assertion.

In any event, even putting aside plaintiffs' inability to specify (and provide evidence) about what design feature caused Leanne's alleged rebreathing, summary judgment would still be proper, with or without Leshner's testimony.

---

[14] Unlike Leshner's theory, this theory does not depend on the permeability of the mattress.  The CO2 is not trapped within the mattress but rather it is trapped within the pocket allegedly formed by the mattress and the infant's head.

[15] For example, though plaintiffs rely upon a 1991 Kemp et al. study as the origin of the toy doll methodology, plaintiffs declined to follow that study's lead in measuring how large a pocket the toy doll's head created, <u>see</u> Dkt. 41-1, Ex. 4 at 1861, and declined to test for any other indication that the subject mattress was particularly soft or formed too large a pocket.

**1.    The Exclusion of Leshner Results in Summary Judgment in Favor of Defendants.**

Leshner's testimony is plaintiffs' only "evidence" about the subject mattress allegedly causing $CO_2$ rebreathing. As discussed above, Leshner's testimony is inadmissible for numerous reasons. Thus, plaintiffs have no evidence about whether the subject mattress' design causes increased rebreathing.

Plaintiffs argue that even without Leshner, the three medical experts are sufficient to survive summary judgment. While those opinions may be sufficient to show that the mattress contributed to or caused Leanne's death, they are not evidence that a design defect existed. None of the doctors examined the subject mattress or any other mattress and therefore have no basis for concluding anything about the mattress' design, much less concluding that some feature of its design was defective. Charitably, the three doctors opine that the mattress caused Leanne's death. As discussed above, that alone does not give rise to the inference that the mattress was defectively designed. The court has little doubt that any mattress would eventually cause death if the occupant was laying face down and unable to move. Thus, without Leshner's testimony, plaintiffs lack evidence showing a <u>design</u> feature of the subject mattress proximately caused Leanne's death.

**2.    Leshner's Testimony Would Not Defeat Summary Judgment.**

Assuming the court found Leshner's testimony admissible, the court would still grant summary judgment.

As an initial matter, plaintiffs conceded that Leshner will not be used to "opine that the product was defective or that it contained 'excessive preventable danger.'" Dkt. 44 at 2. Plaintiffs' concession stems from its conflation of those two concepts. True, defendants have the burden of showing the benefits of the design outweigh its burdens (i.e., that the design contained excessive preventable danger). <u>See Chavez</u>, 207 Cal. App. 4th at 1303. But, as discussed above, that does not relieve plaintiffs from providing evidence that some design feature of the mattress—as opposed to the mattress

generally—caused Leanne's death. Plaintiffs' contrary understanding would require defendants to essentially prove a negative, without knowing <u>what</u> design feature plaintiffs contend caused the injury. Further, it is difficult to see how Leshner could state that the mattress' design caused Leanne's death without opining that the product was defective. Leshner does not attempt to make that illusory distinction. <u>See</u> Dkt. 33-2, Ex. A at 10 (opining that because the subject mattress has high rebreathing, it is hazardous, and defective in design). Because Leshner is plaintiffs only expert who opines on the subject mattress' design, if he will not testify that the product was defectively designed then plaintiffs' have no evidence on that front.

Setting aside that concession, Leshner's testimony is still insufficient to survive summary judgment for multiple reasons. Leshner's testing can at best be used for "ranking different sleep surfaces relative to one another." Dkt. 33-3, Ex. B at 228:10-11. In addition, and as discussed above, plaintiffs have presented no evidence concerning against what objective benchmark Leshner's <u>relative</u> %CO2 rebreathing results should be compared. At the hearing on this motion, the court provided plaintiffs' counsel multiple opportunities to state "a standard for the level of CO2 that is acceptable." Plaintiffs' counsel failed to provide an answer:

> **THE COURT:** So how do I determine that this mattress, if -- if the liability is based upon it having produced an excessively high level, upon what do I base that determination that it's excessively high?
>
> **MR. CARCIONE:** A, we know that -- we know that CO2 causes death. We know that from everybody who will be testifying. B, this thing traps CO2. This -- traps CO2 because it pockets –
>
> **THE COURT:** What's the standard to be applied? How high is too high? Are you simply saying that if indeed some -- a child sleeps on the mattresses and dies, then that's -- whatever level that child reached was too high?
>
>         *     *     *
>
> **MR. CARCIONE:** Okay. Just because the government or somebody else hasn't identified an objective standard doesn't mean that we can't win a case associated with products liability.

**THE COURT:** Who is going to set the standard if it's not set by the professional organization or the government? What expert has opined as to what the appropriate level is?

**MR. CARCIONE:** The appropriate level of $CO_2$, Your Honor, simply is the level -- the lowest possible level that we can get so that the baby doesn't inhale $CO_2$.

**THE COURT:** Are you conceding that there is no objective standard?

**MR. CARCIONE:** There is no objective standard of $CO_2$.

\*          \*          \*

**THE COURT:** What is the standard? If it's not set by science, who is the expert in your papers that has opined as to what an unacceptable level of $CO_2$ rebreathing is responsible for this child's death?

**MR. CARCIONE:** Definitely. Dr. Hardy did it. Dr. Hardy indicated that -- that the -- it was an unacceptable level . . .

**THE COURT:** And what level was that?

**MR. CARCIONE:** The level associated with this product that caused the baby's death.

But none of that is evidence upon which this court or a jury could conclude that the %$CO_2$ level associated with the subject mattress is dangerous or hazardous, much less that it caused Leanne's death. Plaintiffs' argument again amounts to an assertion that because Leanne died, the mattress' design must have caused too much $CO_2$ rebreathing. Plaintiffs' counsel's alternative—the "lowest possible level" of $CO_2$ rebreathing—would necessarily render 41 of the tested mattresses "defective." Further, like Leshner's definition of "hazard," that standard improperly assumes that any amount of $CO_2$ rebreathing is dangerous. An incorrect assumption. In short, because there is no evidence showing what percentage of $CO_2$ rebreathing is objectively dangerous, Leshner's results are meaningless except to show relative $CO_2$ rebreathing performance—the exact thing that Leshner and Carleton et al. limit the testing's relevance to. See Dkt. 34-15, Ex. N at 109:2-8; Dkt. 48-2, Ex. A, at 178:5-20; Dkt. 33-7, Ex. F at 326-27. Relative rebreathing performance, without more, is not evidence of a design defect. See Daubert, 509 U.S. at 591 ("Fit is not always obvious, and scientific

31

1  validity for one purpose is not necessarily scientific validity for other, unrelated

2  purposes.").

3      Plaintiffs' failure to point to an objective CO2 rebreathing standard is compounded

4  by the fact that Leshner's testing does not directly correlate to the CO2 rebreathing

5  experienced in live infants.  As discussed above, both Leshner and Carleton et al. admit

6  that the results obtained in the toy doll study likely exaggerate the amount of CO2

7  rebreathed by a live infant.  Thus, plaintiffs lack evidence tying Leshner's %CO2 results

8  to live infants and also lack evidence tying that unspecified level of CO2 rebreathing to an

9  objective standard regarding dangerous levels of CO2 rebreathing.

10     Without evidence of both of those things, "there is simply too great an analytical

11  gap between the data and the opinion proffered."  Joiner, 522 U.S. at 146.   Leshner's

12  results lack any link, much less a scientifically valid one, to real-life and to the facts of this

13  case and therefore cannot create a triable issue of fact.  The same goes for Leshner's

14  hazard and defect-related conclusions about the subject mattress.  See, e.g., Sanderson,

15  950 F. Supp. at 997-98 ("Thus, the requirement of reliability, or good grounds, extends to

16  each step in an expert's analysis all the way through the step that connects the work of

17  the expert to the particular case." (internal quotation marks omitted)).

18                          **CONCLUSION**

19     For the foregoing reasons, the court rules as follows:  (i) the court GRANTS

20  defendants' Daubert motions to exclude Leshner and Tres' testimony, Dkts. 33, 35; (ii)

21  the court GRANTS defendants' motions to strike Leshner and Tres' rebuttal reports and,

22  alternatively, excludes those rebuttal reports under Daubert, Dkt. 36; (iii) the court

23  GRANTS defendants' motion to strike Leshner's supplemental report, Dkt. 40; and (iv)

24  the court GRANTS summary judgment in favor of defendants on all claims.

25     **IT IS SO ORDERED.**

26  Dated: November 9, 2018

27  _____

28  PHYLLIS J. HAMILTON
    United States District Judge